| | |
|---|---|
| GUCCI 1 FIELD SERVICES, LLC | NO. 23-CA-73 |
| | C/W |
| VERSUS | 23-CA-74 |
| | C/W |
| GLENN REEVES | 23-CA-75 |
| | C/W |
| C/W | 23-CA-76 |
| | |
| GUCCI 1 FIELD SERVICES, LLC | FIFTH CIRCUIT |
| | |
| VERSUS | COURT OF APPEAL |
| | |
| GEORGE CARLILE | STATE OF LOUISIANA |
| | |
| C/W | |
| | |
| GUCCI 1 FIELD SERVICES, LLC | |
| | |
| VERSUS | |
| | |
| SCOTT BELLOW | |
| | |
| C/W | |
| | |
| GUCCI 1 FIELD SERVICES, LLC | |
| | |
| VERSUS | |
| | |
| SEAN GREEN | |

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 808-876 C/W 810-426 C/W 810-428 C/W 810-429, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING

November 08, 2023

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
John J. Molaison, Jr., and Scott U. Schlegel

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUB RECORDS

Morgan Naquin
Deputy, Clerk of Court

**AFFIRMED**

FHW

JJM

SUS

COUNSEL FOR PLAINTIFF/APPELLEE,
GUCCI 1 FIELD SERVICES, LLC
       R. A. Osborn, Jr.

COUNSEL FOR DEFENDANT/APPELLANT,
GLENN REEVES, GEORGE CARLILE, SCOTT BELLOW, AND SEAN
GREEN
       Gerald D. Wasserman

**WICKER, J.**

In these consolidated cases, defendants seek review of the trial court's November 22, 2022 judgment ordering them to repay their former employer for payroll advances. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

In August and September of 2020, plaintiff, Gucci Field Services, L.L.C. ("Gucci"), filed separate lawsuits against four former employees, Glenn Reeves, George Carlile, Scott Bellow, and Sean Green (collectively "defendants"), alleging that they received payroll advances from October of 2018 to January of 2019, and they agreed to repay them but failed to do so.

Each defendant filed an answer, denying Gucci's claims. Defendants acknowledge that Gucci continued to pay their salaries from October 2018 to January 2019, during a period in which Gucci had lost most of its job contracts, but they assert that these funds were never intended to be loans or advances. Rather, they were "wages," which they earned by performing various jobs. Defendants agree that they signed agreements to repay the money, but they claim they did so only under duress, because Gucci would not give them their paychecks if they did not sign the agreements. The trial court signed an order consolidating these four lawsuits on February 26, 2021.

On November 7, 2022, this matter came before the court for a bench trial. At trial, Denise Guccione testified on behalf of Gucci. She stated that her husband, Roger Guccione, who is now deceased, formed Gucci during their marriage, and she handled all of the administrative matters. She asserted that in 2018, one of their major clients, referred to as "Galata," had budget issues and stopped contracting with Gucci and others to perform work at their plant. According to Mrs. Guccione, Mr. Guccione believed at the time that they would be back in operation in about two weeks. Mrs. Guccione testified that they held a meeting

1

with Gucci's employees on October 19, 2018, and told them Gucci would pay their regular salaries until they resumed working with Galata, but they would have to pay the money advanced back over time. After the meeting, Mrs. Guccione sent the employees a letter setting forth their agreement.

Shortly after the meeting, on October 25, 2018, George Carlile and Sean Green signed the agreement to repay Gucci for the advanced hours. Glenn Reeves and Scott Bellow signed the agreement on January 3, 2019, and George Carlile signed the agreement a second time on this date. Mrs. Guccione testified that some of the money was paid back to Gucci via payroll deductions, but each defendant left Gucci while still owing additional amounts. Mrs. Guccione testified that the outstanding balances were $9,344 for Sean Green, $11,644 for Glenn Reeves, $6,433.50 for George Carlile, and $5,429 for Scott Bellow.

On cross-examination, Mrs. Guccione testified that after Mr. Guccione died, the COVID-19 pandemic "closed" their business. She filed an affidavit to dissolve Gucci on August 8, 2022, based on advice from her accountant. When asked if she was trying to represent a company that no longer existed at trial, Mrs. Guccione replied that Gucci existed because there was still a checking account and "legal stuff with the taxes and such."

Mrs. Guccione further testified that while Gucci was not performing work for Galata, defendants came to the office but did not work. There were no particular jobs to assign them, so she would tell them to go home or they would just sit in the back of the office and "chit-chat." Mrs. Guccione testified that Gucci continued to pay its employees, because they thought the business was going to start up again and Gucci did not want to lose them.

Nicholas Aguilar, a former employee of Gucci, testified that when Galata temporarily stopped working with Gucci in October of 2018, Gucci continued to pay them through a salary continuation plan. He stated that he completely

understood that he had to pay the money back and signed documents indicating he agreed to do so. Mr. Aguilar testified that he paid the entire amount back to Gucci.

After Gucci finished presenting its case, defendants moved for a directed verdict, arguing that Gucci could not proceed with the case because it had been dissolved. The trial court denied the motion.

Glenn Reeves testified that he worked for Gucci from 2010 until March of 2019, and he had worked with Mr. Guccione prior to that time. He indicated that Galata was one of Gucci's biggest customers. In 2018, toward the end of the year, Galata's budget was running low so all of the contractors had to leave the facility. He stated that something similar happened in 2015 when they were working at a different facility and had to leave because of budget issues. Mr. Reeves indicated that in both 2015 and 2018, Gucci wanted to retain its employees, so it continued to pay them. He stated that Mr. Guccione wanted to preserve Gucci's relationship with Galata, and that Mr. Reeves and the other employees were key to preserving that relationship. Mr. Reeves stated that from October 2018 to January 2019, he and the other employees worked every day and earned their salaries, even though their work was not billed to a customer. They did various jobs such as servicing Gucci's machines, cranes, and lifts, building trailers, cutting grass and trees, and servicing the Gucciones' hunting camps. He stated that they performed any work Mr. Guccione asked them to do.

Mr. Reeves testified that on January 3, 2019, they were forced to sign documents indicating they would repay the money, because they would not receive their paychecks that day if they did not. Mr. Reeves stated that Mrs. Guccione did not participate in the discussions regarding payments; rather, they dealt strictly with Mr. Guccione, who indicated that neither he nor the other defendants would have to repay Gucci. Mr. Reeves testified that on the documents they signed,

3

"hours worked" were hours that were billed to a client, and "advanced hours" were hours worked but not billed to a client.

Michael Taylor testified that he worked for Gucci from 2012 to 2017, and he worked with Mr. Reeves and Mr. Guccione every day. He stated that in 2015, work became slow and some people were laid off. Mr. Taylor stated that although they were not physically at a plant for a job, they would go to "the shop" or "make customer calls, talk to people, pick up supplies" every day for four to five months. Mr. Taylor stated that they were paid during that time in 2015, because Mr. Guccione wanted to retain them.

Scott Bellow testified that he started working for Gucci in the beginning of 2018. He stated that on January 3, 2019, he signed the document indicating he would pay back the "advanced hours," because he would not get paid that day if he did not sign it. According to Mr. Bellow, Mr. Guccione told them to sign the papers just to appease Mrs. Guccione, but not to worry about it. He stated that he was in the process of getting another job but decided to stay after Mr. Guccione told him to ask the other employees what had happened in 2015. Mr. Bellow indicated that Gucci needed them to stay and be available when Galata called to start work again, because he, Mr. Reeves, Mr. Carlile, and Mr. Green were the crew Galata wanted. He stated that during the time they did not work at Galata, he earned his salary by performing other work for Gucci. He stated that they were "on call" and would never hesitate when Mr. Guccione called them, day or night.

George Carlile testified that he began working for Gucci in 2010. In 2015, work was slow and they were not working at a plant, but they did work around the shop and were paid, as Mr. Guccione had assured them they would be. In 2018, the same situation occurred. Mr. Carlile stated that he only signed the document indicating he would repay the money because he would not receive his paycheck if he did not. After he signed the document, Mr. Guccione told him as a boss and a

friend that signing it was just to make Mrs. Guccione happy and not to worry about it. During this time, he would go to the shop every day and cut grass or work on trailers. He also worked at the Gucciones' fishing camp in Lafitte, cut down trees at their house, and put up fence posts and cut grass at their deer camp. He stated that they performed this work, because they were on Gucci's payroll, and Mr. Guccione told them what they needed to do each day. He stated that he always had discussions pertaining to work and pay with Mr. Guccione, not Mrs. Guccione.

Sean Green testified that he worked for Gucci from 2010 through 2018. He stated that he signed the document agreeing to repay the money, because he had a family to take care of and would not get paid if he did not sign it. Mr. Guccione told him to sign the paper because Mrs. Guccione "is on us about the money." He performed work daily during this time doing anything Mr. Guccione told them to do, including cutting grass and working at the fishing camp and he earned the money he received from Gucci.

At the conclusion of trial, the trial court took the matter under advisement. Thereafter, on November 22, 2022, the trial court rendered a judgment in favor of Gucci and against Mr. Reeves for $11,644, against Mr. Carlile for $6,433.50, against Mr. Bellow for $5,429, and against Mr. Green for $9,344, plus interest and costs. In its reasons for judgment, the trial court pointed out that all of the defendants signed agreements to repay the money, and there was no testimony that anyone complained to Mr. Guccione when Gucci started taking repayment deductions from their paychecks. The court also found that defendants did not show they signed the agreements under duress. Defendants appeal.

## LAW AND DISCUSSION

On appeal, defendants argue that the November 22, 2022 judgment should be reversed, because the trial court erred by finding that defendants accepted advance-on-payroll loans, rather than wages, from October 2018 to January 2019.

5

Defendants contend that while they were not able to work at the Galata plant, they performed other various jobs at Mr. Guccione's request and earned the wages they received. They assert that they knew Galata would not rehire Gucci without them, and they remained loyal to Gucci and did not seek other employment. In return, they contend Mr. Guccione assured them they would not have to repay Gucci for the money they received.

In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. *Palmisano v. Ohler*, 16-160 (La. App. 5 Cir. 12/7/16), 204 So. 3d 1134, 1137; *Stobart v. State through Dept. Transp. and Dev.*, 617 So.2d 880, 882 (La. 1993). Where factual findings are based on determinations regarding the credibility of witnesses, great deference is afforded to those factual findings under the manifest error standard. *Rosell v. ESCO*, 549 So.2d 840 (La. 1989).

A party who seeks to demand performance of an obligation is required to prove its existence by a preponderance of the evidence. La. C.C. art. 1831; *Artificial Lift, Inc. v. Production Specialties, Inc.*, 626 So.2d 859 (La. App. 3 Cir. 1993), *writ denied*, 634 So.2d 394 (La. 1994). Once the plaintiff meets the initial burden of establishing the existence of an obligation, the burden shifts to the defendant to come forth with sufficient evidence to rebut or cast doubt upon the plaintiff's claim. *Byles v. Bank of Coushatta*, 50,120 (La. App. 2 Cir. 11/25/15), 184 So.3d 789, 792, *writ denied*, 16-0254 (La. 4/4/16), 190 So.3d 1208.

In the present case, Gucci met its initial burden of establishing that defendants were obligated to repay the money at issue. Mrs. Guccione testified that when Gucci temporarily stopped working with Galata in October of 2018, she and Mr. Guccione held a meeting with the employees and told them that Gucci

would continue to pay their salaries, but they would have to repay the amounts over time when Gucci was operational again. In support of its position, Gucci submitted documents listing the employee's actual hours worked, vacation hours used, advanced hours, and deductions for insurance, which were signed by each employee under the provision, "I AGREE TO REPAYMENT OF ADVANCED HOURS/INSURANCE AS STATED." These written agreements are contracts between the parties indicating that defendants agreed to repay the funds received.

A written contract is the law between the parties, and the parties will be held to full performance of the obligations flowing from their contract. *Lantech Construction Co. v. Speed*, 08-811 (La. App. 5 Cir. 5/26/09), 15 So.3d 289, 293. However, the law is clear that written contracts may be modified by oral contracts and the conduct of the parties. *Id.*

The party asserting that an obligation has been modified must prove by a preponderance of the evidence facts or acts giving rise to the modification. La. C.C. art. 1831; *Driver Pipeline Co. v. Cadeville Gas Storage, LLC*, 49,375 (La. App. 2 Cir. 10/1/14), 150 So.3d 492, 501, *writ denied,* 14-2304 (La. 1/23/15), 159 So. 3d 1058. Modification of a written agreement can be presumed by silence, inaction, or implication. *Id.* Whether there is an oral agreement that modified the written contract is a question of fact. *Id.*

Defendants contend that the written agreements they signed were modified by verbal agreements with Mr. Guccione that they would not have to pay the money back. They assert that a similar situation occurred in 2015, and they were not required to pay the money back.

A trial court's determination of the existence or nonexistence of an oral contract is a finding of fact governed by the manifest error or clearly erroneous standard of review. *Read v. Willwoods Community*, 14-1475 (La. 3/17/15), 165 So.3d 883, 888. When evaluating the evidence needed to establish the existence of

an oral contract, the trial court is allowed to make credibility determinations. *Steve Owens Construction, Inc. v. Bordelon*, 17-1320 (La. App. 1 Cir. 2/27/18), 243 So.3d 601, 604-605. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Schexnayder v. Exxon Pipeline Co.*, 01-1236 (La. App. 5 Cir. 3/13/02), 815 So.2d 156, 160. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was reasonable. *Dutton v. O'Connell*, 04-1287 (La. App. 5 Cir. 4/26/05), 901 So.2d 602, 605-06, *writ denied*, 05-1605 (La. 1/9/06), 918 So. 2d 1049; *Stobart*, 617 So.2d at 883.

After considering the testimony and evidence, the trial court did not find that the written agreements were modified by any oral agreement between the parties. This determination was reasonable, based on the record before us, and thus, we cannot say it was manifestly erroneous.

Defendants argue that the trial court erred by accepting the self-serving testimony of Mrs. Guccione, who did not work in the field with defendants and was not present when they made verbal agreements with Mr. Guccione. They assert that the trial court should have accepted the testimony of a disinterested former employee, Michael Taylor, regarding Gucci's practice of continuing to pay key employees during times when clients were not using their services in order to retain their employees.

However, the trial court found that Mrs. Guccione was a credible and impressive witness, and that she was honest, knowledgeable and direct. The court also noted that her testimony was supported by written agreements signed by defendants themselves. Further, Mr. Aguilar was a former employee of Gucci, just like Mr. Taylor, and he testified that he understood he had to pay the salary advances back and that he paid them back in their entirety.

Although defendants claim Mrs. Guccione's testimony was self-serving, the trial court found defendants' testimony to be self-serving and not credible. The court further provided that there was no testimony that defendants objected when repayment deductions were taken from their paychecks. The trial court had to make credibility determinations and found Mrs. Guccione's testimony to be more credible than defendants' testimony.

Defendants further argue that the trial court erred by failing to find that they were entitled to wages for any of the work performed while they waited for Galata to rehire Gucci.

An advance is an unconditional loan which carries with it the obligation to repay. *Boyd v. Gynecologic Associates of Jefferson Parish, Inc.*, 08-1263 (La. App. 5 Cir. 5/26/09), 15 So.3d 268, 272. Wages are vested rights that are equivalent to "the amount then due under the terms of employment." *Id.* Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even if the appellate court may feel that its own evaluations and inferences are as reasonable. *Himel v. State ex rel. Dept. of Transp. & Dev.*, 04-274 (La. App. 5 Cir. 10/12/04), 887 So.2d 131, 137-38, *writ denied*, 04-2802 (La. 3/18/05), 896 So. 2d 999; *Rosell,* 549 So.2d at 844.

The trial court made the reasonable determination that the funds at issue were advances, not wages that were actually earned. The court found that the descriptions of the jobs they performed for Gucci were more consistent with a personal friend/employer relationship than with earning their salaries. The record does not show that these findings were manifestly erroneous.

Defendants also contend that Gucci violated La. R.S. 23:634(A) when it required them to sign a written agreement to repay the money they earned and when Gucci began withholding money from their paychecks. La. R.S. 23:634(A) prohibits an employer from requiring an employee to sign a contract forfeiting his

9

wages if they are discharged or resign prior to completion of the contract, and also provides that employees shall be entitled to the wages actually earned up to the time of their discharge or resignation. However, based on the trial court's finding that the funds at issue were advances, not wages, defendants did not show they were required to sign contracts forfeiting wages in violation of La. R.S. 23:634(A).

Defendants also claim that they signed the agreements to repay the money under duress, because they would not receive their paychecks if they did not sign them. La. C.C. art. 1959 provides, in pertinent part:

> Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation.

The trial court found that the circumstances under which defendants signed the written agreements did not rise to the level of duress. We find no error in this determination.

The next issue raised by defendants on appeal is whether the trial court erred by finding that Gucci had a right of action to proceed with this litigation, when Gucci had filed an affidavit to dissolve the company during these proceedings and no longer existed at the time of trial. They also assert that the trial court erred by applying La. R.S. 12:1-1405A(1) and (5) and B(5) and (6), which pertain to corporations not limited liability companies, to the present case.

We agree that the trial court erroneously relied on La. R.S. 12:1-1405, which addresses the effect of dissolution and specifies the actions a dissolved corporation may take to wind up and liquidate its business and affairs. The applicable law in this case is that pertaining to limited liability companies, as set forth in La. R.S. 12:1301, *et seq*. However, the law pertaining to limited liability companies supports the same result in this particular case.

La. R.S. 12:1335.1(A) provides, in pertinent part:

> In addition to all other methods of dissolution, if a limited liability company is no longer doing business, owes no debts, and owns no immovable property, it may be dissolved by filing an affidavit with the secretary of state executed by the members or by the organizer, if no membership interests have been issued, attesting to such facts and requesting that the limited liability company be dissolved.

Although no documents were presented to show that Gucci was dissolved by affidavit, Mrs. Guccione testified that she filed an affidavit to dissolve Gucci on August 8, 2022.

La. R.S. 12:1340(C) provides:

> Upon the issuance of the certificate of dissolution, the separate existence [of a limited liability company] shall cease as of the effective date stated in the certificate, *except for the sole purpose of any action or suit commenced theretofore by*, or commenced timely against, *the limited liability company*. (Emphasis added.)

In support of their position that Gucci did not have the right to pursue its claims against them, defendants cite *Pocket Billiards and Bar, L.L.C. v. Fast & Affordable College Student Movers, Inc.*, 22-109 (La. App. 4 Cir. 8/10/22), 346 So.3d 399, in which the Fourth Circuit held that a limited liability company dissolved by affidavit loses its right to pursue claims. However, a closer look at the *Pocket Billards* decision reveals that it actually supports Gucci's position.

In *Pocket Billiards*, 346 So.3d at 400-401, the plaintiff, Pocket Billiards and Bar, L.L.C., hired the defendant moving company to move their pool tables, and they alleged that the pool tables were damaged during the move. Defendant filed an exception of no cause of action asserting that Pocket Billiards had "no right of action, or no interest to institute the suit," because Pocket Billiards had filed an affidavit to dissolve the limited liability company prior to filing its lawsuit. The trial court granted the exception of no cause of action and dismissed Pocket Billiards' claims. *Id.* at 401. On appeal, the Fourth Circuit reviewed the trial court's judgment as sustaining an exception of no right action, noting that the

exception specifically alleged that Pocket Billiards had no right of action and it is the substance of the pleading, not the caption, that determines its effect. *Id.* The appellate court affirmed the dismissal of Pocket Billiards claims, finding it had no right of action, because it was voluntarily dissolved by affidavit prior to the filing of the lawsuit. The Fourth Circuit found, "there is no public policy protecting the claims of a limited liability company that chose to avail itself to the provisions of La. R.S. 12:1335.1 *prior to filing suit for damages* incurred by the limited liability company." (Emphasis added.) *Pocket Billiards*, 346 So.3d at 405.

In the present case, Gucci was not dissolved prior to the filing of this lawsuit. Gucci filed its four lawsuits against defendants in August and September of 2020. According to Mrs. Guccione, Gucci filed its affidavit to dissolve the limited liability company on August 8, 2022. Therefore, pursuant to La. R.S. 12:1340(C) and in accordance with the Fourth Circuit's reasoning in *Pocket Billiards*, *supra*, Gucci had a right of action to pursue its claims against defendants.

**DECREE**

For the reasons stated above, we affirm the trial court's November 22, 2022 judgment in favor of Gucci and against defendants.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 8, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 23-CA-73
### C/W 23-CA-74 & 23-CA-75 & 23-CA-76

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
R. A. OSBORN, JR. (APPELLEE)          GERALD D. WASSERMAN (APPELLANT)

**MAILED**